# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| | ) | 8:11CR76 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| PIMENIO VELA HERRERA, | ) | RECOMMENDATION |
| a/k/a Manuel Herrera, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by the defendant Pimenio Vela Herrera (Manuel Herrera) ([Filing No. 15](#)). Manuel Herrera is charged in the Indictment with a conspiracy to manufacture methamphetamine in violation of [21 U.S.C. §§ 841(a)(1)](#) and [846](#). Manuel Herrera seeks to suppress all evidence seized and statements made by Manuel Herrera following his detention and arrest on September 24, 2010, by officers of the Alliance Police Department (APD) in Alliance, Nebraska.

An evidentiary hearing was held on Manuel Herrera's motion on May 6, 2011. Manuel Herrera was present for the hearing along with his counsel, Deborah D. Cunningham. The United States was represented by Assistant U.S. Attorney Justin C. Dawson. During the hearing, the court heard the testimony of Alliance Police Officer Timothy Peterson (Officer Peterson) and Alliance Police Detective Dusty Bryner (Detective Bryner). The court received into evidence the following Exhibits: Exhibit 1 - an affidavit for a search warrant and Exhibit 2 - a search warrant. A transcript (TR.) of the hearing was prepared and filed on May 13, 2011 ([Filing No. 24](#)).

## FINDINGS OF FACT

On September 24, 2010, Officer Peterson was in uniform and driving a marked patrol unit during his night patrol shift (5:00 p.m. to 5:00 a.m.) in Alliance, Nebraska (TR. 5). Early in his shift, Officer Peterson received information from the Box Butte County Sheriff's Office to be on the look-out for a male wearing a green hooded sweatshirt who had just assaulted someone with a 2X4 and fled the crime scene (TR. 5). Because of a

recent problems, Officer Peterson was also instructed to keep an eye out for possible burglaries and automobile break-ins in Alliance (TR. 6). Around 1:33 a.m. on September 24, 2010, Officer Peterson was driving his patrol car and he observed two males carrying objects in their hands while walking in the 300 block of East Fourth street (TR. 6). It was unusual to see pedestrian traffic in this residential area at that time of night (TR. 21-22). One of the males had a black bag with a white object and the other male had an indiscernible object in his hand (TR. 6). Both males were wearing green hooded sweatshirts and blue jeans (TR. 6). As Officer Peterson drove within seventy-five feet of these males, one of the males looked at Officer Peterson, then both males took off running (TR. 6). Officer Peterson turned his patrol car onto East Sixth and observed the males run between two houses (TR. 6-7). Officer Peterson parked his patrol car, got out, yelled that he was a police officer and commanded the two men to stop (TR. 7). Neither man complied (TR. 6).

As Officer Peterson was about to go in between the two houses, one of the males came back south and toward the front entrance door of 408 East Sixth Street (TR. 7). That male was the defendant Manuel Herrera (TR. 7). Officer Peterson was familiar with Manuel Herrera from previous police contacts (TR. 8). Officer Peterson stopped Herrera and asked him the name of the other male and Manuel Herrera said it was his cousin (TR. 8).

While Officer Peterson was waiting for another officer, Officer Grumbles, Officer Peterson shined his flashlight into the darkness between the houses and saw several small cases lying on the ground in the grass next to a tree (TR. 9). The cases resembled the items Officer Peterson saw one of the two men carrying at the time he approached them (TR. 9). When Officer Grumbles arrived, Officer Peterson asked Officer Grumbles to secure Manuel Herrera, which Officer Grumbles did by simply watching Manuel Herrera without cuffing him (TR.10).

Officer Peterson then began to look for the other man, Oscar Herrera (TR. 10). Officer Peterson located Oscar Herrera when Officer Peterson heard through an open door that someone was rummaging in the basement of 408 East Sixth Street and Officer Peterson called him outside (TR.10). Officer Peterson saw Oscar Herrera, whom Officer

Peterson knew by previous contact, at the bottom of the stairs (TR. 11). Oscar Herrera came up the stairs as directed and Officer Peterson observed a bag of marijuana protruding from Oscar Herrera's front pants pocket (TR. 11). Officer Peterson searched Oscar Herrera and found a folded piece of tin foil with an X-Acto knife and a razor blade inside and a white powdery substance in the tin foil folds (TR.11).

As Officer Peterson walked back with Oscar Herrera to where Office Grumbles was watching Manuel Herrera, Officer Peterson checked the items he saw on the ground near the tree (TR. 11). Officer Peterson found a black nail file case, a coffee grinder with a lid, and a black and gray collapsible, portable cooler (TR. 11). Officer Peterson asked Oscar Herrera to whom the items belonged and Oscar Herrera declined to answer Officer Peterson (TR. 12). Officer Peterson examined the items, which he noted did not have any condensation or moisture on them as the surrounding grass did (TR. 13). In the black nail file case, Officer Peterson found three small baggies of a brownish white powdery substance consistent with methamphetamine (TR. 13). The black portable cooler was opened by Sergeant Digmann who arrived on the scene (TR. 13-14). Inside was clear plastic tubing with a bottle cap taped to the end along with several other bottles (TR. 14). One of the bottles had the words "Lawn Saver" on it and another had "muriatic acid" written on a label (TR. 14). Officer Peterson recalled being previously instructed by Detective Bryner that these items were used to make methamphetamine (TR. 14). Officer Grumbles informed Officer Peterson there was some white powdery substance on the top and bottom of the coffee grinder (TR. 15). Officer Peterson believed the items were used in making methamphetamine; therefore, he instructed Officer Grumbles to place Manuel Herrera in handcuffs and transport him to the law enforcement center (TR. 16). Officer Peterson already had Oscar Herrera in handcuffs and transported him back to the law enforcement center (TR. 16).

After their arrival at the law enforcement center, Manuel Herrera and Oscar Herrera were placed in separate rooms to await interviews (TR. 26). APD Detective Bryner, who is assigned to the Western Intelligence Narcotics Group (WING), was asked to interview the Herreras (TR. 25). Manuel Herrera was seated alone in the interview room when Detective Bryner advised Manuel Herrera of his *Miranda* rights by means of a waiver of

rights form (TR. 26). Manuel Herrera acknowledged his rights, signed the form, and agreed to talk with Detective Bryner (TR. 27). Manuel Herrera stated he stayed with his girlfriend at 520 Sweetwater in Alliance since he arrived in Alliance two months prior to the arrest (TR. 27). Manuel Herrera told Detective Bryner that he does not use methamphetamine or know anything about cooking methamphetamine (TR. 28). In a separate interview, Oscar Herrera told Detective Bryner the methamphetamine found outside 408 East Sixth Street was that of Manuel Herrera and Manuel Herrera was carrying it (TR. 29). Oscar Herrera also told Detective Bryner that he had assisted in the manufacture of methamphetamine and cleaning up the chemicals afterward (TR. 32). These admissions were made after some denials by Oscar Herrera and some cajoling by Detective Bryner (TR. 35).

Based upon the information obtained at the scene and during the interviews of the Herreras, Detective Bryner prepared an affidavit for a search warrant for 520 Sweetwater in Alliance (TR. 29; Exhibit 1). Detective Bryner testified he did not include all of his prior encounters with Oscar Herrera in the affidavit (TR. 39). However, when he met with Judge Silverman, Detective Bryner told the judge about his prior contacts with Oscar Herrera but did not tell the judge about some of Oscar Herrera's inconsistent statements during the interrogation on September 24 (TR. 41). Detective Bryner testified about his meeting with Judge Silverman as follows:

> Q. What specifically did you tell Judge Silverman at the time he was reviewing the affidavit?
> A. It's not an exact quote, but to the best of my knowledge, I've got a good rapport with Judge Silverman. Before he reviewed the affidavit, he asked me what was going on. I told him we had a possible methamphetamine lab and that during the course of the interview, Oscar Herrera, who's in the affidavit, made some pretty big admissions to what his involvement was in being involved with things and that some of the information that he gave me I could verify and then he went ahead and reviewed the affidavit.
> Q. And the information he gave you that you could verify, that information was placed in the affidavit of the search warrant, correct?
> A. Yes, it was.

(TR. 45).

4

The affidavit for the search warrant (Exhibit 1) sets out the events of the evening of September 24, 2010, as recounted by Officer Peterson, and the results of Detective Bryner's interviews with Manuel and Oscar Herrera. Detective Bryner set forth his experience in investigating clandestine methamphetamine labs and the Herreras' connections to the Sweetwater address. Based on the affidavit, Judge Silverman signed a search warrant for 520 Sweetwater and the warrant was executed by Detective Bryner and others, whereupon various items of evidence were seized (TR. 33; Exhibit 2).

The affidavit in support of the search warrant contains information about Detective Bryner's law enforcement experience, particularly in the area of methamphetamine laboratory investigations, and specifically provides:

> [Officer Timothy] Peterson observed two males, later identified as Manuel NMI Herrerra, DOB 6/21/1972 and Oscar L Herrera DOB 8/21/1989 running in the 400 block of East 6th St, toward 408 East 6th Street, Alliance Box Butte County Nebraska. Peterson observed one of the males was carrying a small to medium sized black-nylon-lunch-type-cooler bag. As Peterson attempted to contact the males, both males ran into the back yard of 408 East 6th.
>
> Peterson was able to immediately locate and contact Manuel Herrera (hereinafter referred to as M. Herrrera), who was detained. Peterson tried to find Oscar Herrera, but was unable to locate O. Herrera in the back yard. Peterson was outside in the back yard when he heard a rummaging sound coming from an open door on the backside (north side) of 408 East 6th. The door leads to the basement from the outside.
>
> Peterson called for the person to come out of the basement. A male came out who Peterson recognized as the other male who had run from him. This male was identified as O. Herrera. In a search of O. Herrera's person, Peterson located a baggie with a green leafy substance that appeared to be marijuana. A field test determined that the baggie contained approximately 1 ounce of Marijuana. An Exacto knife wrapped in tin foil was also located.
>
> While searching the backyard area, Peterson located a glass jar with clear liquid in it and a small black case, which was similar to a manicure case. The small case contained a substance consistent with methamphetamine. A field test of

the substance confirmed it to be four grams of methamphetamine.

Peterson located a Mr. Coffee, coffee grinder which had a white powdery residue in it and also on the lid to the coffee grinder. Peterson located the small to medium sized black-nylon-lunch-type-cooler bag which was carried by one of the individuals as they were running. The bag contained an ice compress, which was cut open, one pair of pliers, one pair of wire cutters, 2 AAA energizer lithium batteries, one hose with a bottle cap taped to the end, one glass jar, three canning jar lids, one bottle of "Lawn Saver" with white pellets inside, one bottle of muriatic acid, one plastic bottle cap with a hole in the center.

Also in the back yard is a garden shed approximately ten feet by ten feet. The shed is white metal with a rusty roof. The doors were open. Peterson located a Gatorade bottle in the shed, while searching for O. Herrera. This bottle had a separated liquid in it. This liquid is consistent with methamphetamine oil from a methamphetamine lab. Peterson knows through his training and experience that all of these items are consistent with the manufacture of methamphetamines.

Bryner was called and informed these items had been recovered and responded to assist.

Bryner conducted an interview with O. Herrera at the Alliance Police Department interview room. O Herrera was advised of his Miranda rights which he understood, waived and agreed to speak to Bryner. Bryner also conducted an interview with M. Herrera at which time he was also advised of his Miranda rights, which he waived and agreed to speak to Bryner. During this interview M. Herrera told Bryner that he lived at 520 Sweetwater, Alliance Nebraska Box Butte County, with his girl friend Frances Orpeza AKA Frances Chagolla. Bryner verified through the Box Butte County Assessor files that 520 Sweetwater belongs to Frances Ann Chagolla.

O. Herrera advised Bryner approximately 4 days ago O. Herrera and M. Herrera, went to 408 East 6th Street, to cook a batch of methamphetamine. The residence at 408 East 6th Street belongs to a male by the name of "John". Bryner

> verified through the Box Butte County Assessor's records that the residence belongs to John Carlos Corson. Bryner was able to determine through a check of police records Corson's date of birth is 11/24/1970.
>
> O. Herrrera told Bryner that after they are done "cooking" the "meth" they often dispose of items at the 520 Sweetwater address. Most of the items are burned in a fireplace in a garage. The garage is detached from the house. O. Herrera believe there were still items such as Coleman fuel cans and other products used in the manufacture of methamphetamines still at 520 Sweetwater.
>
> * * *
>
> Wherefore your affiant believes that there is probable cause to believe that the house and or garage or other out buildings at 520 Sweetwater, Alliance Nebraska contains methamphetamine and or items used in the manufacture of methamphetamine . . . are in the residence and that a warrant for 520 Sweetwater, Alliance Nebraska and any outbuildings. 520 Sweetwater is single family single story white house with a blue/gray roof. There is a wood privacy fence approximately mid way around the house extending around the back yard. The front door faces east.

**See** Exhibit 1.


# LEGAL ANALYSIS

## A.     Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched and that his expectation is reasonable. *[Minnesota v. Carter](#)*, 525 U.S. 83, 88 (1998); *[United States v. Boyster](#)*, 436 F.3d 986, 992 (8th Cir. 2006). The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *[Rakas v. Illinois](#)*, 439 U.S. 128, 143-44 n.12 (1978); **see also** *[Smith v. Maryland](#)*, 442 U.S. 735, 740-41 (1979). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they

were searched or seized illegally." *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting** *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

The Eighth Circuit recognizes:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized. A court must determine: (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

*United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994) (internal citations omitted). "Fourth Amendment rights are personal and may not be vicariously asserted." *United States v. Randolph*, 628 F.3d 1022, 1026 (8th Cir. 2011) (**quoting** *United States v. Washington*, 197 F.3d 1214, 1216 (8th Cir. 1999)). Therefore, the court "must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez*, 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

A person may have an expectation of privacy in a residence he does not own. *United States v. Thurman*, 625 F.3d 1053, 1056 (8th Cir. 2010). Additionally, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90 (internal citations omitted); *United States v. Wiest*, 596 F.3d 906, 909, 910 (8th Cir. 2010) (holding overnight guest had expectation of privacy except from others living in the residence with access to common areas). Accordingly, individuals seen by a police officer in a residence bagging cocaine may not have standing to challenge the search of the premises because the individuals are merely conducting a purely commercial transaction on the premises for a relatively short period of time. *Id.* at 85, 90-91.

In this case, the record shows Manuel Herrera claimed he had been living at the 520 Sweetwater residence for two months (TR. 27). There is no evidence disputing his claim. The government argues Manuel Herrera lacked standing to contest a search of the residence or its garage because of his status as a guest (TR. 3). Under the circumstances present, Manuel Herrera has standing to contest the search of the residence and its garage because, although he did not own the residence, he was at least an "overnight guest."

**B.     Detention and Arrest**

The defendant argues the officers lacked legal justification for his detention and arrest. "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (**quoting** *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The government has the burden to prove justification existed for any restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004).

One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Saenz*, 474 F.3d at 1136 (**citing** *Terry,* 392 U.S. at 30). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d

1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'" *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)).

"In making reasonable-suspicion determinations, reviewing courts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (internal quotation and citation omitted). "Reasonable suspicion must be supported by 'specific and articulable facts.'" *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (**citing** *Terry*, 392 U.S. at 21). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality." *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001); **see** *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008). The Supreme Court has held

> "[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Indeed, *Terry* itself involved "a series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." [Further] . . . "innocent behavior will frequently provide the basis for a showing of probable cause," and . . . "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

*United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (internal citations omitted). "[A] stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010).

Officer Peterson observed the Herreras walking in a neighborhood in the middle of the night. Both of them matched the description of a suspect wanted in connection with an assault. Additionally, at the time the area had an unusual number of burglaries and vehicle break-ins. Officer Peterson suspected the Herreras were involved in either the assault or the other illegal conduct. The officer's suspicions were based on the Herreras' proximity to the illegal conduct in question and their attire. Under the circumstances, the court finds the officer acted reasonably in attempting to conduct a *Terry* stop of the men.

Based on the totality of the circumstances, the court finds a reasonable articulable suspicion existed to justify an investigatory stop and temporary detention of the Herreras. **See** *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (finding reasonable suspicion existed based primarily on the "temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop"). Further, the detention was directly related to the purpose of the *Terry* stop, to ascertain whether either of the Herreras were the individual reported to have been involved in the assault or engaged in other criminal activity. **See** *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) ("The [*Terry*] stop and inquiry must be reasonably related in scope to the justification for their initiation.").

The Herreras exhibited unusual and alarming behavior when they ran from the officer. This behavior justified, if any justification were necessary, the officers' continued interest in the Herreras. **See** *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009) (noting the defendant's "behavior must be considered as a whole and in the light of the officers' experience and specialized training"). Further, the officers were justified in detaining Manuel Herrera while attempting to locate the second male and the items Officer Petterson had seen the men carrying. Location of the items, which appeared to be implements to manufacture methamphetamine with methamphetamine residue, near the house provided probable cause for Manuel Herrera's further detention and arrest. **See** *Binion*, 570 F.3d at 1040; **see also** *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (noting officer's detection of contraband supports otherwise reasonable arrest).

In any event, the officers lawfully seized the abandoned items located near the house. "Any expectation of privacy in property 'is forfeited upon its abandonment.'" *United*

*States v. Voice*, 622 F.3d 870, 878 n.3 (8th Cir. 2010). "Generally, abandoned property may be recovered by police and used for evidentiary purposes." *United States v. Simpson*, 439 F.3d 490, 494 (8th Cir. 2006). "Whether property has been abandoned is a question of fact that turns primarily on whether the objective facts available to the investigating officers evidenced (i) the suspect's denial of ownership, and (ii) that he physically relinquished the property in a way that demonstrated abandonment." *Voice*, 622 F.3d at 878 n.3. "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." *United States v. Liu*, 180 F.3d 957, 962 (8th Cir. 1999). Similarly, a subsequent unlawful seizure of the defendant does not change the analysis. **See** *Simpson*, 439 F.3d at 494.

In this case, there is no evidence Manuel Herrera specifically made statements denying ownership of the items. In any event, whomever left the items clearly relinquished the property in a way that demonstrated abandonment. The items were left in the back yard area without being concealed. Under these circumstances, abandonment was an apparently voluntary decision of free will. Alternatively, no evidence suggests Manuel Herrera has standing to contest a search of the yard at the residence on 6th Street.

**3.     Sufficiency of the Affidavit**

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, *Search & Seizure* § 3.7(d) at 412 (4th ed. 2004). As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213, 238 (1983):

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See** *id.*; *United States v. Morrison*, 594 F.3d 626, 631-33 (8th Cir. 2010). "Probable cause has been shown if the warrant application and

affidavit describe circumstances showing 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Robinson*, 536 F.3d 874, 877 (8th Cir. 2008) (**quoting** *Gates*, 462 U.S. at 238). The Eighth Circuit has explained the issuing magistrate's obligation as follows:

> The task of the issuing magistrate is to make "a practical, **common-sense decision** whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." [*Gates*, 462 U.S. at 238]. Where there is no evidentiary hearing before the magistrate judge, the probable cause determination must be based upon, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982). **Affidavits must be read in "a common-sense and realistic fashion,"** *United States v. Cadwell*, 864 F.2d 71, 74 (8th Cir. 1988) (**citing** *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). "Deference is accorded an issuing magistrate's probable cause determination . . ." *United States v. Brown*, 584 F.2d 252, 256 (8th Cir. 1978).

*United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (emphasis added); **see** *United States v. Thurman*, 625 F.3d 1053, 1056 (8th Cir. 2010). Additionally, "[b]oth circumstantial evidence and inferences may support probable cause." *United States v. Swope*, 542 F.3d 609, (8th Cir. 2008) (internal citations omitted).

The defendant argues the affidavit lacks sufficient information to allow the issuing judge to determine probable cause because the affidavit fails to indicate whether Oscar Herrera changed his story, whether he was under the influence of drugs, or his attitude or level of willingness to provide the information (TR. 49). The defendant did not seek a *Franks* hearing, but during the evidentiary hearing indicated his arguments are similar to a *Franks*-type argument (TR. 47-48). "In a warrant affidavit, the government 'need only show facts sufficient to support a finding of probable cause.' Therefore, 'recklessness may

be inferred from the fact of omission of information from an affidavit . . . only when the material omitted would have been "clearly critical" to the finding of probable cause.'" *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995) (**quoting** *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)) (internal citation omitted). A defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," only then "the Fourth Amendment . . . requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171.

The defendant identifies inconsistent statements made by Oscar Herrera, or conflicts between Oscar Herrera's initial and subsequent versions of events, that were not mentioned in the warrant affidavit. Specifically, Oscar Herrera initially denied involvement, then made incriminating statements about his involvement in the manufacture of methamphetamine. The defendant argues these inconsistencies and conflicts were material to Oscar Herrera's credibility and, consequently, to the judge's probable cause determination. **See** *United States v. McNeil*, 184 F.3d 770, 776 (8th Cir. 1999). The court disagrees. The information contained in the affidavit must be truthful "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165. In this case, it is clear the affiant believed, or appropriately accepted, Oscar Herrera's admissions as true and ascribed no belief in the initial denials. The defendant fails to provide the court with any evidence suggesting a *Franks* hearing

is warranted in this matter. The defendant did not provide the court with any evidence showing the alleged omissions in the affidavit – i.e., Oscar Herrera's change of his story, whether he was under the influence of drugs, or his attitude or level of willingness to provide the information – were 'clearly critical' to the finding of probable cause.

In any event, the affidavit in support of the search warrant contains information that provides the officers with a fair probability that contraband or evidence of a crime would be found at the residence or within the garage. The officers located items consistent with the manufacture of methamphetamine near the Herreras after seeing those items with the Herreras. Manuel Herrera stated he was staying at the Sweetwater residence. Independently, Oscar Herrera told officers the men had manufactured methamphetamine at the residence where they were found, but had taken items for disposal to the Sweetwater residence. Oscar Herrera's statements were "presumptively credible." **See *United States v. Leppert*, 408 F.3d 1039, 1041-42 (8th Cir. 2005)** (noting ample evidence supported informant's reliability where he provided detailed firsthand observations about illegal methamphetamine operation and made statements against his own penal interests); **see also *United States v. Harris*, 403 U.S. 573, 583 (1971)** (plurality opinion) ("Admissions of crime . . . carry their own indicia of credibility-sufficient at least to support a finding of probable cause to search."); ***United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996)** (noting "statements against the penal interest of an informant naturally carry considerable weight" particularly when informant directs police to the fruits of the crime). Moreover, the officers corroborated the information from the Herreras about the names of the owners with the residences at issue, which increases the consideration of Oscar Herrera's other information as reliable. **See *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009)** ("An informant may also be considered reliable if the information he or she supplies 'is at least partially corroborated' by other sources. . . . 'Even the corroboration of minor, innocent details can suffice to establish probable cause.'"). Finally, part of the information provided by Oscar Herrera was consistent with the physical evidence found regarding the manufacture of methamphetamine. Under the totality of the circumstances, the application and affidavit contains sufficient probable cause to support issuance of the search warrants at issue here.

### 4. *Leon* Good Faith Exception

Even assuming, moreover, that the warrant application was technically deficient for failing to include Oscar Herrera's initial denials of wrongdoing, it is clear that the searching officers acted in objectively reasonable good-faith reliance on the warrant. **See *United States v. Leon*, 468 U.S. 897, 922 (1984)**. An objectively reasonable officer could believe the application to search the residence, which was premised on an admission from a suspect that items used in cooking methamphetamine had been disposed of at a particular residence, in which the other suspect claimed to reside, was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotations omitted). Additionally, "when assessing whether officers acted in objectively reasonable good-faith reliance on a warrant, we consider in this circuit the totality of the circumstances, including what the affiant knew but did not include in the application for the warrant." *Thurman*, 625 F.3d at 1056. In this case, Detective Bryner and the other officers had a history of interactions with the suspects and Detective Bryner had personally interviewed them both at which time he was able to observe their demeanor and manner in making statements, first denying, then admitting knowledge about the methamphetamine evidence already discovered. This additional information bolsters the officers' good-faith reliance on the warrant.

### 5. Statements

The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383 (1914). Such rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963); *Nardone v. United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *United States v. Fellers*, 397 F.3d 1090, 1094 (8th Cir. 2005). Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence may still be admissible if it is gained by means sufficiently distinguishable to be purged of the primary taint of the illegality.

Having found Herrera's detention and arrest were constitutionally permissible and the search warrant was supported by adequate probable cause, the court finds Herrera's statement was not tainted by any "poisonous tree" as claimed by Herrera under **Wong Sun**. Herrera does not assert any other constitutionally infirm conduct rendered his statements involuntary. Similarly, no evidence suggests Herrera made any involuntary statements. For the reasons stated above, Herrera's motion to suppress should be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Herrera's Motion to Suppress ([Filing No. 15](Filing No. 15)) be denied.

**ADMONITION**

Pursuant to [NECrimR 59.2](NECrimR 59.2) any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 10th day of June, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.